Johnson, Chief Judge.
The trustees of this special road district acted under the 46th section of the towns and *556 cities’ act, as amended in 1853 (vol. 51, p. 376 O. L.) 2 S. C. 1509, which reads as follows:
“ No order directing the opening of a new road, street, or alley, or the taking of any land for the improvement, straightening, or changing any road, street, or alley shall be made by the said trustees,'unless they shall all concur therein ; and no order shall be made for the improvement or repairs of any road,, street, or alley, except on the petition of two-thirds of the resident owners of the lots of land through or by which such road, street, or alley, or part thereof to be improved or repaired shall pass.”
In Corry v. Gaynor, 22 Ohio St. 584, it was held: “ The trustees of special road districts have no power, under section 46 of the act of May 3, 1852, above referred to, as amended by the act of May 12, 1853 (vol. 51 Ohio Laws, 376), to order the improvement of streets, and charge the cost thereof upon the abutting lots, except upon the petition of two-thirds of the resident owners of the lots thus situated; and the finding of the trustees, that such petition was presented, is not conclusive of the fact.”
The question is therefore settled, that it is necessary that a petition should be presented, signed in fact by two-thirds of the resident owners of the lots of land; notwithstanding the trustees may have found such petition was presented, the contrary may be shown, and the court below having reserved this question as to whether the improvement w-as petitioned for, to this court, by two-thirds of the resident lot-owners, we proceed to the examination of that question.
The question here presented goes to the jurisdiction of the trustees to make the order for the improvement. There were seven resident owners of lots, exclusive of Mrs. Shay and her children, and Mrs. Dusold and her children. Of the seven, four signed the petition of September 23, 1868. Two others of the seven, not on this petition, signed a previous petition for the same improvement, dated August 19, 1868, so that six out of the seven were on different petitions for this improvement.
It is claimed that the names of the two on the first pe *557 tition should not be counted, because : 1. The trustees acted solely on the second petition, and did not consider the first.
If the first petition was in fact pending, or if these two signers were at the time actually petitioners, the trustees had jurisdiction, although they had not if we look to the second petition alone.
The first petition was rejected, because of a supposed defect in one of the signatures.
The merits of the proposed improvement were not passed upon. The petition was examined and placed on file. The project was not abandoned, but was still under consideration by the promoters, and on the 23d of September, within thirty days after the first petition was presented, the second was filed. The trustees, supposing it contained the proper number of signers, did not look further, and made the improvement.
The so-called rejection of the first petition was, in legal effect-, a refusal to take action, by reason of a defect of a signature, and not on the merits.
It is said the promoters of the improvement regarded the first petition as dead, because, they immediately proceeded to get up a new one'. If the construction which the promoters may have put on this transaction is to guide the court, then it was a mistake to ask the court to decide the question.
The real question is, was the first petition binding, and not how did the promoters or trustees regard it.
The trustees, it is true, looked only at the second petition, yet if in fact other names were on file, which they might have counted, the power to make the order may be supported. It is not essential that all signers should be on one petition.
Neither is the finding by the trustees, based on the second petition, conclusive of the fact.
In Corry v. Gaynor, supra, it was held that such finding may be impeached, and, a fortiori, it may be sustained.
*558 Therefore, the finding of the trustees, that two-thirds signed the second petition, is impeached by showing that two of the signers, Mrs. Shay and Mrs. Dusold, were not lot-owners. And, for a like reason, their power may be supported, by showing that there were additional petitioners to those actually counted.
The question, then, is, were these two, who signed the first petition, asking for this improvement, petitioners when the order was made ?
It is said that the petition had been rejected for a sup- . posed defect in one of the signatures.
This so-called rejection could be nothing more than a refusal to act. The petition was not rejected, but received, examined, and filed, and remained on file when the order was made. The trustees refused to act on it, for the defect in a signature. They did not refuse to order the improvement, if the requisite number of signers were obtained, and evidently it was understood they would make the order, if signers enough were obtained. Hence the second petition.
These two petitioners never withdrew or revoked their petition, nor does it appear they -would have done so if it had not been rejected.
It may be- conceded, that had these two petitioners known of the refusal to act on the first petition, and that a new one was circulated, they might have rested on that and been free. This knowledge may have made them abstain from revoking their assent. As it is not shown, however, that they had such knowledge, we must presume they continued to be petitioners on the 25th of September.
This presumption is greatly strengthened, in view of the fact that the scheme for the improvement had not been rejected or abandoned, but was still pending; that they had not withdrawn or revoked the petition on their part, and that it -is not shown that these two petitioners ever objected to the improvement; but, on the contrary, so far as appears, continued to favor the improvement, and have paid their assessments without objection.
*559 Notice of the passage of the ordinance for this improvement, passed September 25th, was published in a newspaper of general circulation in the county. On the 22d of July previous, the grade of this street had been established by ordinance; and on the 14th of October, this grade was adopted, and from October 23d to November 4th, public notice was given, in the Cincinnati Gazette, for the letting of the work. Notice was thus legally brought home to all the resident lot owners.
If such was not the fact it was proper to have shown it, and in view of the exhaustive resistance that has been made to this assessment, it is clear it would have been shown to defeat the jurisdiction of the court, if such was the fact.
Eor these reasons the presumption is, that at the time the order was made, these two were actually petitioners and might have been counted by the trustees.
2. The second petition was signed by Mrs. Shay, a widow, and her children, one aged ten, and the other nine years, of whom she was guardian. The land descended to the children from their father; and they, with their mother, resided on it. That these children were resident owners of the lots of land, through or by which the improvement extended, is clear; but whether, beiug minors, they can be petitioners, or whether their guardian, residing on the premises, can sign for them, is a question. Another is, do these children count as one or as two resident owners, and as one or two petitioners ?
The third finding is, that by the authority of Mrs. Shay, and in her presence, her name and that of her children were signed to the "petition, by one Stokes, one of the trustees, she being unable to write.
In Corry v. Gaynor, it was held that neither Mrs. Shay nor Mrs. Dusold were property owners by virtue of their dower rights.
The question then is, Could these children, either by themselves, or by their guardians, become petitioners ?
The jurisdiction of the trustees to act, is made to depend *560 on being asked for by two-thirds of the resident lot owners. The legislation might have authorized them to act, without such petition. The object was to prevent them from imposing an assessment, unless two-thirds of the resident owners asked for it. To petition was not a contract, as counsel assumed. By the act of signing a petition they imposed no obligation on themselves or on the land. Such a petition simply clothed the trustees with a discretion to make the improvement and assess the property or not, as in their judgment was proper. The power to create an obligation was vested in the trustees, and not in the petitioners.
As the signing of such a petition, by a sufficient number, clothed the trustees with a power, not only to impose burdens upon their lauds, but on the lands of others, we think minors have no capacity to sign such a petition. Minors are incapable of binding their own lands by contract, and it could not have been intended to vest in them the power to clothe the trustees with authority to charge the lands of themselves and others for the expense of improving streets.
The manifest purpose of the statute was, to obtain an expression of views of the resident tax-payers liable to assessment.
This expression might have been obtained by an election, in which the resident property owners would be entitled to vote.
The petition is a shorter, and equally effective, method of voting on this question. It could not have been intended to confer this franchise or power on ‘minors.
The abuses to which such a power in minors is liable are so manifest that we conclude the legislature never intended it. The power to vote taxes or assessments must rest in the hands of those liable to pay them.
Under our system of taxation, the guardian of minors, or those standing in that relation, represent their property, and are made responsible to the government for the burdens imposed on it.
*561 By the act of April 8, 1865 (S. & S. 756), “ every person of f ull age and sound mind, not a married woman, shall list the real property of which she is the owner, etc. . . . The property of every ward shall be listed by his guardian; of every minor, child, idiot, or lunatic, having no other guardian, by his father, if living; if not, by his mother, if living,” etc.
By section 69 of the tax laws (S. & C. 1403), every person shall be liable to pay tax for the' lands of which he has the care as guardian, etc.
By section 70, it is made such guardian’s duty to list such lands for taxation, and if he neglects to do so, the auditor may add a penalty of twenty-five per centum; and by section 72, “every person holding lands as guardian,” who neglects or refuses to list or pay the taxes on the land, shall be liable to Ms ward for any damages sustained.
By the statutes relating to guardians, it is made their duty “to manage the estate for the best interest of his ward.”
These statutes show that the intention was to invest the guardian with the control of the estate of his wards, for purposes of taxation, and to hold him responsible to his ward for an abuse of that power. They show further, that it was not intended to impose any responsibility on minors, nor clothe them with any authority over their own lands in relation to taxation. In, the management of the ward’s lands, the guardian has power to do all acts reasonable and proper for the preservation and use of the real estate. This includes all duties relating to listing and payment of taxes, as well as renting and keeping the real estate in proper condition.
Mrs. Shay was guardian of her children, and resided on the land with them. We think she had the power to sign this petition to the trustees to order the improvement. Whether her wards will be bound by her acts in their settlement with their guardian, is another question, to be *562 determined by the same rules that govern all other official acts, where a discretion in the management of the estate is vested in the guardian. As such guardian, Mrs. Shay could represent the land of her wards. The signing by her wards in her presence, and by her direction, is equivalent to her signing as guardian.
Speaking for myself alone, I think where there are several resident tenants in common, all should unite, either by themselves, where they aré adults, or by guardians, if minors, to authorize them to be counted; and that such cannot be counted as one, but all jointly constitute a .resident owner ; but it is not necessary to determine this. If each is counted, then there were eleven resident owners and eight petitioners. If the Sbay children and the Dusold children are each counted one, then there were nine resident owners and seven petitioners, not counting the Dusold children.
In either case, the necessary two-thirds were petitioners.
Cause remanded, to render judgment for the plaintiff.